UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| SHERRIE M. SWEENEY | ) | |
| | ) | |
| V. | ) | NO. 2:15-CV-202 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff's application for Disability Insurance Benefits was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that adverse determination. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 15]. The defendant Commissioner has filed a Motion for Summary Judgment [Doc. 17].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). ASubstantial evidence@ is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, Aa decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right. *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 47 years of age at the time of the ALJ's hearing decision, turning 50 in July of this year. She has a high school education. She has past relevant work experience as a collector, a collections supervisor, and a parts specialist. According to the vocational expert who testified at the administrative hearing, the jobs of collector and collection supervisor were between sedentary and light due to the fact the plaintiff had to stand "more than two plus hours." (Tr. 40-41). The job as a parts specialist was described by him as medium and semi-skilled because she had to occasionally lift 50 pounds and frequently lift 10 to 15 pounds and stand for over five hours in a work day. (Tr. 41).

The defendant's brief contains the following information relating to plaintiff's medical history:

> Christopher Matthews, M.D., Plaintiff's primary care physician, examined Plaintiff on February 13, 2012, for a regularly scheduled thyroid check (Tr. 230). She reported depressed mood, excessive irritability, and severe anxiety (Tr. 230). She stated that these symptoms had been present for weeks and were severe (Tr. 230). She also reported increased joint pain and fatigue from her fibromyalgia, and stated that she had been experiencing moderately severe burning in both lower legs for weeks (Tr. 230). She denied fatigue, impaired vision, blurred vision, headaches, or muscle weakness (Tr. 230-31). Examination showed tenderness to palpation in the bilateral upper extremities; however, lower extremity examination was normal and no tender points were documented (Tr. 231-32). She had normal range of motion of the cervical spine (Tr. 231). Reflex and sensation exams were normal, and gait was normal (Tr. 231-32). Examination of Plaintiff's thyroid showed that it was normal

2

size, non-tender, positioned midline, and normal during swallowing (Tr. 231). Laboratory studies showed that Plaintiff's thyroid was functioning in the normal range (Tr. 234-35). Mental status examination showed that Plaintiff was oriented to person, place, and time (Tr. 232). Her mood was depressed and her affect appropriate (Tr. 232). Plaintiff's memory was intact and Dr. Matthews did not document ongoing memory deficits (Tr. 232). Dr. Matthews diagnosed hypothyroidism, acquired; major depression (single episode); acute stress reaction; fibromyalgia; and neuropathy (Tr. 232). He prescribed Gabapentin 300 mg twice a day for Plaintiff's neuropathy (Tr. 232), Zoloft and Xanax for Plaintiff's depression (Tr. 232), and instructed her to continue all current thyroid medications as prescribed (Tr. 232).

On February 21, 2012, Plaintiff told Dr. Matthews that her neuropathy was slowly improving (Tr. 227). Her anxiety and depression had stabilized since increasing her dosage of Zoloft (Tr. 227). Plaintiff's physical examination and mental examinations were normal (Tr. 228). Dr. Matthews assessed neuropathy, anxiety, and depression (Tr. 228). He prescribed Flexeril and increased her Gabapentin to three times a day (Tr. 228).

Plaintiff returned to Dr. Matthews on February 29, 2012, and complained of severe burning and numbness in her legs that had been present for weeks (Tr. 225). She denied eye pain, changes in vision, headaches, or muscle pain or weakness (Tr. 225). Examination showed spasticity in the bilateral lower extremities; otherwise, Dr. Matthews noted no abnormal movements or atrophy (Tr. 225). Reflexes, sensation, and gait were normal (Tr. 225-26).

On March 21, 2012, Plaintiff told Dr. Matthews that her neuropathy was stable (Tr. 223). She stated that she had developed fairly rapid and significant deterioration of vision since her last visit (Tr. 223). She could not read even with glasses and complained of eye discomfort (Tr. 223). Examination of the eyes and optic and trigeminal nerves were normal (Tr. 223). Motor and reflex examinations were completely normal in the lower and upper extremities (Tr. 223-24). Dr. Matthews referred her for a more thorough eye evaluation and instructed her to follow-up in four weeks (Tr. 224).

On March 23, 2012, Brandon Lee, M.D., of the Regional Eye Center, examined Plaintiff for complaints of worsened vision over the past few months, including blurred and double vision and halos around objects (Tr. 198). Her symptoms were worse with bright lights, when she was tired, or when she tried to read (Tr. 198). She also stated that she had been having trouble remembering things (Tr. 198). Examination showed fourth or trochlear nerve palsy in the right eye (Tr. 199). Dr. Lee advised Plaintiff to return after obtaining a magnetic resonance imaging (MRI) scan to evaluate her right cranial 4th nerve (Tr. 199). There is no indication that Plaintiff returned to Dr. Lee for further treatment.

On April 5, 2012, Michael Dew, M.D., a neurologist, examined Plaintiff for complaints of burning and tingling in her eyebrows, lips, arms, flank, and legs that had been persistent since January (Tr. 207). She was unaware of exacerbating or remitting situations and denied focal weakness or fatigue (Tr. 207). She reported occasional double vision mostly when tired, made worse when working on

3

computers (Tr. 207). She reported constant, daily headaches, also since January (Tr. 207). Prior to January, she had experienced intermittent headaches during the previous year (Tr. 207). She also complained that she occasionally misused words or did not make sense (Tr. 207). Her motor, sensory, coordination and reflex examinations were all normal (Tr. 208). She scored 24/30 on the Montreal Cognitive Assessment predominantly with problems with recall, attention, and word fluency (Tr. 208). Her eye examination was essentially normal (Tr. 208). A recent electromyogram (EMG) and nerve conduction study (NCS) had been unremarkable (Tr. 208). Dr. Dew indicated the examination showed no signs of polyneuropathy (Tr. 208). He stated that the widespread paresthesias were difficult to categorize as they were bilateral and patchy, and were not reproducible on examination (Tr. 208). Plaintiff told Dr. Dew that Gabapentin was helping some and he increased her medication to 600 mg (Tr. 208). He diagnosed subjective diplopia (double vision), paresthesias, and mild cognitive impairment (Tr. 208-09).

      Plaintiff obtained a brain MRI scan on April 16, 2012 (Tr. 204). It was unremarkable with and without contrast (Tr. 204).

      On April 23, 2012, Plaintiff told Dr. Matthews that she was having forgetfulness and difficulties with her job performance (Tr. 221). She was not on any medications (Tr. 221). She reported difficulties with finding the correct words when speaking, performing well at work, and retaining short-term memories (Tr. 221). Her symptoms had been non-progressive and were mild to moderate in severity (Tr. 221). Upon review of symptoms, Plaintiff denied any neck stiffness, changes in vision, or joint pain or swelling (Tr. 221). Dr. Matthews noted that Plaintiff's brain MRI scan was normal (Tr. 222). Her physical examination was normal – she appeared well-nourished, well-developed, alert, in no acute distress, well-tended appearance, normal posture, general level of motor activity normal, and cooperative during history and examination (Tr. 222). He assessed a confusional spell and instructed Plaintiff to follow-up in three months (Tr. 222).

      On May 9, 2012, Dr. Dew noted Plaintiff had experienced some symptomatic control with the Neurontin and that her brain MRI scan was unremarkable (Tr. 205). She still complained of frequent headaches (Tr. 205). She denied any fixed numbness, new weakness, or visual complaints (Tr. 205). He noted that she claimed she was "unable to work" due to her symptoms because (by her account) they interfered with her ability to lift and carry (Tr. 205). Plaintiff's physical examination was normal (Tr. 205). Dr. Dew noted her evaluation had failed to uncover an etiology behind her multiple complaints (Tr. 206). He ordered more testing including an MRI scan of the cervical spine for Plaintiff's complaints of incontinence and advised her to follow up after completion (Tr. 206). Dr. Dew indicated that although Plaintiff had multiple subjective symptoms that she felt interfered with her job, he did not have findings on evaluation to explain her complaints (Tr. 206). He acknowledged that she could reasonably continue FMLA (Family Medical Leave Act) while the above studies were completed, but that if there were no changes, then there would not be any restrictions or limitations thereafter (Tr. 206). The MRI scan showed chronic bulging disc osteophyte complex on the left at C5-6 with moderate

4

left-sided spinal canal and neural foraminal stenosis (Tr. 210). There is no indication in the record Plaintiff returned to Dr. Dew following her imaging study or for ongoing treatment of her alleged neuropathy and neck pain.

On May 10, 2012, Plaintiff told Dr. Matthews that her symptoms were gradually improving and that she could possibly return to work for a 40-hour week starting May 31, 2012 (Tr. 219). Examination continued to show normal strength, tone and reflexes in the bilateral upper and lower extremities (Tr. 219). Upon physical examination, Dr. Matthews noted Plaintiff was grossly oriented to person, place and time; communication ability within normal limits, voice quality normal, articulation of speech normal, no aphasias noted, and attention and concentration were normal (Tr. 219-20). Her motor examination and reflexes were normal (Tr. 219-20). Dr. Matthews completed FMLA paperwork indicating Plaintiff could return to work as of May 31, 2012 (Tr. 220).

Plaintiff returned to Dr. Matthews the next day, May 11, 2012, and reported that she was very upset over her apparent loss of jobs due to medical issues (Tr. 217). She presented in some distress with depressed mood, and appropriate affect (Tr. 217). Psychiatric examination was otherwise normal (Tr. 217). Dr. Matthews diagnosed generalized anxiety disorder and depressive disorder, not elsewhere classified (Tr. 217).

On July 23, 2012, Plaintiff told Dr. Matthews that her neck discomfort and visual changes were unchanged and she could not work (Tr. 215). She also complained of fluid retention (Tr. 215). He encouraged her to pursue options such as vocational rehabilitation and Medicaid (Tr. 215). Upon examination, Plaintiff appeared well-nourished, well-developed, alert, and in no acute distress (Tr. 215). Her judgment and insight, thought processes, and associations were normal (Tr. 215). Her mood was depressed and her affect appropriate (Tr. 215). Dr. Matthews assessed visual disturbance, neuropathy, and edema, and prescribed Lasix for her fluid retention (Tr. 215).

On December 13, 2012, Plaintiff told Dr. Matthews she was experiencing severe neck pain and stiffness radiating into her left shoulder (Tr. 263). She denied numbness in the bilateral arms (Tr. 263). She reported no improvement with the use of anti-inflammatory medications and massage (Tr. 17-263). She denied fatigue, headaches, anxiety, or depression (Tr. 263). She had tenderness and reduced ranged of motion of the neck, but no spinal tenderness or misalignment (Tr. 263-64). Examination of the bilateral upper extremities was normal with no tenderness to palpation noted and normal range of motion (Tr. 264). She had normal strength, tone, and bulk in the bilateral upper and lower extremities, with normal reflexes (Tr. 264). Dr. Matthews assessed degeneration of cervical intervertebral disc, fibromyalgia, muscle spasm, and osteoarthritis of spine prescribed ibuprofen, Lortab (20 pills with no refills), and Xanax (Tr. 264).

On January 17, 2013, B. Wayne Lanthorn, Ph.D., performed a psychological consultative examination of Plaintiff (Tr. 239-43). Dr. Lanthorn noted she arrived promptly, unaccompanied, and had a valid driver's license (Tr. 239). Upon interviewing her, it was apparent she was oriented in all spheres (Tr. 239). Plaintiff

5

presented with good grooming and hygiene, and seemed to walk without difficulties (Tr. 241). Dr. Lanthorn noted that during the course of the evaluation, Plaintiff did not exhibit signs or indications of ongoing psychotic processes, delusional thinking, or hallucinations of any type (Tr. 241). Plaintiff's affect was very flat and blunt and she cried throughout the evaluation (Tr. 241). She reported that she had hypersomnia and slept 14 to 15 hours each night (Tr. 241). She reported that anti-anxiety medication was effective in controlling panic attacks (Tr. 242). She did not take her anti-depressant medications as prescribed (Tr. 241). She told Dr. Lanthorn that her activities included performing laundry duties, preparing meals and going to the grocery store once a week with her daughter (Tr. 242). Dr. Lanthorn summarized that results of the clinical interview revealed a middle-aged woman who was functioning in the Low Average Range intellectually (Tr. 242). She was reporting a high degree of ongoing chronic pain from multiple sources and a failing visual system possibly due to nerves in her eyes (Tr. 243). She was extremely depressed and had been off and on for many years (Tr. 243). She had both panic attacks and generalized anxiety, and often felt on edge, tense, and fidgety (Tr. 243). During the course of the evaluation, Plaintiff displayed cognitive blocking at several points where she would be attempting to say something and simply be unable to remember how she had planned to finish the sentence (Tr. 243). Her affect and mood was one of an agitated depression (Tr. 243). Her communication skills were relatively intact (Tr. 243). Dr. Lanthorn diagnosed major depressive disorder, recurrent, severe; generalized anxiety disorder; panic disorder without agoraphobia; pain disorder associated with both psychological factors and medical conditions, chronic; and physically abused as an adult (Tr. 242). Dr. Lanthorn indicated Plaintiff would be capable of learning simple tasks, but more complicated tasks to be performed routinely on the job would present mild-to-moderate limitations (Tr. 243). With regard to interacting with others in the workplace, Dr. Lanthorn felt Plaintiff would have moderate or greater limitations (Tr. 243). In the area of sustaining concentration and persisting effectively at task, Plaintiff would have moderate limitations (Tr. 243). Lastly, dealing the changes and requirements of the workplace, Plaintiff would have mild-to-moderate limitations (Tr. 243).

     On January 24, 2013, Wayne Gilbert, M.D., performed a physical consultative examination of Plaintiff (Tr. 245-48). She reported that fibromyalgia had been diagnosed when she had onset of joint and muscle pain (Tr. 245). She also complained of neck pain, neuropathy in the left (non-dominant) arm, back pain, and arthritis (Tr. 245). Dr. Gilbert noted that Plaintiff was cooperative, but did not make full effort on examination and stated that she was unable to do some maneuvers requested of her (Tr. 347). He noted she walked without antalgia (Tr. 247). Examination showed full range of motion of the cervical spine and dorsolumbar spine, though Plaintiff told Dr. Gilbert that it was going to "hurt later" (Tr. 247). Straight-leg-raise seated was negative; supine at 90 degrees; she complained of pain in the back of the leg and in the hips bilaterally (Tr. 247). She had limited range of motion of the shoulders (Tr. 247). She stated she never put her hands over her head as it made it feel like the blood drained out of her hands and her arms got very weak

6

(Tr. 247). She had strong finger grips and intact sensation (Tr. 247). She complained of "locking" sensation in hip joints with range of motion testing (Tr. 247). Strengths of the major muscle groups were 4 to 5/5 (Tr. 247). She could stand on either foot while maneuvering the other foot, but declined to squat and reported being unable to walk on her heels (Tr. 247). She could walk on her toes and heel-to-toe walk (Tr. 247). Plaintiff's vision with glasses was 20/100 in the right eye, 20/100 in the left eye, and 20/80 with both eyes (Tr. 247). Dr. Gilbert noted fibromyalgia diagnosed by her primary care provider and not confirmed in the medical record that he could find, chronic neck pain with neuropathy of the left arm with cervical anatomic abnormalities and apparent radiculopathy, hypothyroidism, visual disturbances, chronic back pain with radiculopathy or neuropathy, episodic edema, and reports of depression (Tr. 248). Dr. Gilbert opined that Plaintiff could sit for 30 minutes, stand for 30 minutes, walk for 50 yards, and occasionally lift or carry 20 pounds (Tr. 248). He noted she would be limited in tasks requiring visual acuity and would have difficulty reading either print or computer screens (Tr. 248).

On February 19, 2013, Calvin Miller, M.D., performed a consultative ophthalmology examination of Plaintiff to evaluate her vision complaints (Tr. 253-54). A comprehensive and dilated eye examination showed best corrected vision at distance was 20/20 in each eye and at near was 20/30 in each eye (Tr. 253). This was with a refraction slightly different than that currently being used (Tr. 253). Uncorrected vision at the beginning of the examination measured 20/50 in the right and left eye at distance and 20/400 in the right eye and 20/200 in the left eye at near (Tr. 253). Pupillary reactions and eye movements were normal, as were fields to confrontation (Tr. 253). There were no abnormalities of the external ocular structures or of the lids (Tr. 253). At slit examination, the cornea, the anterior chamber, and the iris of the lens were all normal (Tr. 253). Through dilated pupils, the disc was healthy (Tr. 253). The retinal blood vessels appeared normal, as did the macula and the retinal periphery (Tr. 253). A Humphrey visual field test was obtained and interpreted as a normal visual field in each eye (Tr. 253). Dr. Miller indicated Plaintiff had an inordinate disconnect between the complaints of her visual loss and the findings on examination (Tr. 253). With encouragement during the course of the examination, the above noted vision was obtained (Tr. 253). Effort seemed less than her best, apparently because of her fears of aggravating a headache (Tr. 253).

On April 5, 2013, Dr. Matthews wrote a letter stating that Plaintiff "has a chronic medical problem that has left her disabled and unemployed since February 29, 2012" (Tr. 24, 262).

On October 21, 2013, Plaintiff followed up with Dr. Matthews for her symptoms of anxiety over job stress and chronic medical problems (Tr. 260). She wanted to continue Zoloft and substitute Buspar for Xanax (Tr. 260). Her only complaints were new skin lesions, hot flashes, and anxiety (Tr. 260). Upon examination, Dr. Matthews noted a cyst and erythema on Plaintiff's chest (Tr. 261). Her examination was otherwise normal (Tr. 261). Dr. Matthews diagnosed abscess; anxiety state, unspecified; and menopausal syndrome, and prescribed Buspirone (anxiolytic) (Tr. 261).

7

[Doc. 18, pgs. 2-11].

In addition to the foregoing medical records, the ALJ also evaluated the opinions of state agency reviewing psychologists and physicians who reviewed the plaintiff's medical records, both initially and on reconsideration. At the initial level, state agency psychologist Dr. Robert Coyle, Ph.D. evaluated the plaintiff's medical records, including the consultative examination by Dr. Lanthorn and records from her treating sources. Dr. Coyle opined that the plaintiff would have moderate difficulties in the areas of restriction of activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence or pace. (Tr. 67). Dr. Coyle gave great weight to Dr. Lanthorn's opinion and found it was "consistent with the reported objective findings." (Tr. 68).

Similarly, Dr. Joseph Curtsinger, M.D., a state agency physician who evaluated plaintiff's records, opined that the plaintiff could perform a reduced range of light work. He found, based upon all the records and Dr. Gilbert's consultative exam, that the plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 6 hours, and sit for 6 hours in an 8 hour work day, he found that the plaintiff had several postural limitations and a manipulative limitation in overhead reaching. He did feel that Dr. Gilbert's assessment was too restrictive. (Tr. 69-72).

At the reconsideration level, another state agency reviewing psychologist, Dr. Dorothy Tucker, Ph.D., also evaluated the plaintiff's medical records. Her findings were basically identical to those of Dr. Coyle. (Tr. 86-87). She too gave great weight to the evaluation and

8

opinion of Dr. Lanthorn. She also found that the plaintiff could understand and remember simple and low-level detailed instructions, while she had sustained concentration and persistence limitations, she could sustain concentration, persistence and pace if carrying out simple instructions. (Tr. 92-93). Dr. Tucker also opined that plaintiff "would function best in work settings that do not require frequent interaction with the public." (Tr. 93). Likewise, Dr. Anita Johnson, M.D., made the same basic findings with respect to plaintiff's functional capacity as those made by Dr. Curtsinger, except she found no visual limitations. (Tr. 89-92).

On May 13, 2014, the ALJ rendered his hearing decision. After describing the five-step sequential evaluation process (Tr. 13-14), he found, at step one, that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 29, 2012. (Tr. 13-15). The ALJ then proceeded to the second step, at which he was required to determine whether or not the plaintiff had any severe impairments. He found that she had certain "medically determinable impairments," which were degenerative disc disease of the cervical spine, neuropathy, fibromyalgia, vision problems, edema, arthritis, and thyroid problems. He then stated that the plaintiff "does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months...," and that she "does not have a severe impairment." (Tr. 15). He then proceeded to discuss the medical evidence.

With respect to fibromyalgia, he found that the requirements of Social Security Ruling 12-2p were not met. Her examination by her primary care provider on February 23, 2012

9

"showed tenderness in the bilateral upper extremities to palpitation; however, lower extremity examination was normal and no tender points were documented." Also, he noted that Dr. Matthews had *only* diagnosed fibromyalgia on two occasions. (Tr. 16-17).

With respect to neuropathy, back problems, and arthritis, he recounted the findings and treatment by Dr. Matthews and Dr. Dew, and the examination by Dr. Gilbert, covering the period from February 23, 2012 to January 24, 2013. (Tr. 17-18). Particularly, he noted the MRI by Dr. Dew in May 2012. It showed "chronic bulging disc osteophyte complex on the left at C5-6 with moderate left-sided spinal canal and neural foraminal stenosis." The ALJ noted plaintiff apparently did not return to Dr. Dew for further treatment. (Tr. 17). He mentioned that plaintiff saw Dr. Matthews on December 13, 2012 with severe neck pain and stiffness. He then stated that the plaintiff only saw Dr. Matthews once after that on October 22, 2013, for treatment of an abscess on her chest and chronic anxiety which Dr. Matthews said was "over job stress and chronic medical problems." (Tr. 260). The ALJ noted that at that visit plaintiff "had no musculoskeletal or neuropathic complaints." (Tr. 18). Based on all of this, the ALJ found "the claimant did not have a severe impairment related to neuropathy, arthritis or spine disorder. While the cervical MRI did show abnormal findings, there is indication [sic] the findings resulted in any functional limitations for 12 or more continuous months…[t]he claimant did not routinely complain of neck pain with radicular symptoms and reported that medications were effective." (Tr. 18).

He then discussed the plaintiff's vision problems (Tr. 18-19) and found no severe impairment in this regard. He noted that Dr. Miller, the examining ophthalmologist, opined

10

that the plaintiff's "effort seemed less than her best, apparently because of her fears of aggravating a headache." The ALJ found no severe impairment related to her vision. (Tr. 19). Likewise, he mentioned the scant treatment for edema and found it was not severe. (Tr. 19). Regarding the plaintiff's thyroid condition, the ALJ noted she was on medication for it, and that she did not regularly seek treatment for complaints of thyroid problems. Thus, he found it was not a severe impairment. (Tr. 19).

The ALJ then discussed plaintiff's anxiety and depression. He mentioned her treatment by Dr. Matthews, and the medications Dr. Matthews prescribed, and the fact that Dr. Dew had found the plaintiff had problems with recall, attention and word fluency but diagnosed a mild cognitive impairment. (Tr. 20). He described Dr. Lanthorn's consultative exam in detail. In particular, he noted that while Dr. Lanthorn stated that the plaintiff's "affect was very flat and blunt and she cried throughout the evaluation…," the plaintiff "reported that anti-anxiety medication was effective in controlling panic attacks." (Tr. 20). He noted Dr. Lanthorn's "moderate or greater limitations" in the various areas of mental functioning. (Tr. 21). The ALJ then stated that the plaintiff had not routinely sought mental health treatment and "reported that medications were effective in controlling her symptoms." He did not actually state, based on this, she did not have a severe mental impairment, but instead began to discuss his other finding that the plaintiff was less than credible. (Tr. 21). He began this analysis by saying that "the evidence fails to substantiate the claimant's allegations of total disability." (Tr. 21). In this regard, he discussed her daily activities as described to Dr. Lanthorn and in a function report filed in connection with her application for

11

benefits. He felt her limitations were "self-imposed." *Id.* He dismissed the plaintiff's assertions that with no insurance she could not afford proper treatment; he stated that "[t]he records do not show that the claimant has been turned away from an emergency room or refused treatment from any physician." *Id.* Also, he noted that even when she had insurance she did not routinely seek treatment. *Id.* As further support for his finding that the plaintiff was not credible, he stated that she "has misrepresented the facts relevant to the issue of disability." In this regard, he mentioned that Dr. Miller, the ophthalmologist, had stated that the plaintiff did not seem to put forth her best effort in the vision test because of fear it would worsen a headache she was experiencing. He said she testified to lack of energy and fatigue, but had failed to mention those symptoms to treating providers and even denied she had fatigue to them. He likewise noted that the plaintiff did not routinely present to Dr. Matthews, her family doctor, with mental health problems. In particular, he mentioned that the plaintiff had no mental health complaints when she saw Dr. Matthews on May 10, 2012, but complained of depression to him the next day when she learned she had been terminated from her job. Finally, he stated that the plaintiff stopped working due to being laid off as opposed to having a disabling impairment. In this regard, the Court notes that she was apparently on family medical leave between her onset date of February 29, 2012, and the date she was laid off on May 10, 2012. The ALJ also stated that he found no deterioration in the plaintiff's condition since the layoff, and that thus, her impairments would not prevent the performance of that job. (Tr. 22). Finally, he stated that he found her not credible because "the medical evidence fails to reveal findings to support pain or discomfort to the degree

alleged."

The ALJ then discussed the weight he gave to the various physicians and psychologists. He gave little weight to Dr. Gilbert, the consultative examiner, because Dr. Gilbert "apparently relied quite heavily on the claimant's subjective complaints and reported limitations." The ALJ also found that "Dr. Gilbert's assessment is without substantial support from the other evidence of record, which obviously renders it less persuasive." (Tr. 23).

The ALJ then discussed the opinion of Dr. Lanthorn, the consultative psychologist who examined the plaintiff at the request of the state agency. He gave Dr. Lanthorn's opinion little weight for various reasons. First, the ALJ stated that Dr. Lanthorn did not take into account the plaintiff's alleged failure to take her anti-depressant medications as prescribed. Second, he rejected the opinion because Dr. Lanthorn based his opinion, in part, on plaintiff's allegations of pain, which the ALJ found not to be credible as discussed above. The ALJ also stated that Dr. Lanthorn examined the plaintiff's records, and his opinion was not consistent with those records. (Tr. 23).

The ALJ also gave little weight to the opinion of Dr. Curtsinger, the state agency physician who evaluated plaintiff's claim at the initial level. In this regard, the ALJ found that Dr. Curtsinger's limitation of plaintiff to a reduced range of light work with postural, manipulative, and vision limitations was not supported by the medical evidence of record, stating that "[t]hese limitations are not supported by the preponderance of medical evidence of record showing essentially normal examinations…and only occasional complaints of

13

pain." (Tr. 23). The ALJ discussed the opinions of Dr. Anita Johnson, the state agency doctor who evaluated plaintiff's records at the reconsideration level, and who basically agreed with the limitations opined by Dr. Curtsinger except for any visual impairment. He found her opinion was also not supported by the medical evidence of record. (Tr. 24).

The ALJ also gave little weight to Dr. Coyle and Dr. Tucker, the state agency psychologists. They opined that the plaintiff could deal with basically only simple instructions, and would function best in work settings that did not require frequent interaction with the public. He found that "[t]he medical evidence of record does not support this conclusion…" (Tr. 23).

He then discussed the opinion of Dr. Matthews, the treating physician, who opined that the plaintiff was disabled and unemployed. First, the ALJ found that Dr. Matthews' opinion was not entitled to controlling weight Under SSR 96-2p because it was not supported by his treatment notes and was "contradicted by substantial evidence." The ALJ then stated he was giving little weight to Dr. Matthews' opinion because it was conclusory and did not discuss the medical evidence upon which it was based. Likewise, he found that it was at odds with the treatment records, particularly because "Dr. Matthews indicated in May 2012 the claimant could return to a 40-hour workweek and the record does not document deterioration in her health." (Tr. 23-4). The Court would note that Dr. Matthews' May 10, 2012 treatment note actually says that the *plaintiff* advised *Dr. Matthews* that she might be able to return to work for a 40 hour week starting 5/31/12. (Tr. 219).

The ALJ then found that the medical evidence and the plaintiff's activities of daily

14

living support the conclusion that plaintiff does not have any severe impairment. He did discuss the plaintiff's non-severe mental impairment to the extent that he found no more than mild limitations in the areas of functioning as to which Dr. Lanthorn and the state agency psychologists found the levels of limitation to be at least moderate. (Tr. 24-25).

Summarizing his findings, the ALJ found that the plaintiff's physical and mental impairments did not significantly limit her ability to perform basic work activities, and thus were not severe. However, he stated that "even if the claimant were limited to light or sedentary exertion, she could perform her past relevant work." Accordingly, he found that she was not disabled. (Tr. 25).

Plaintiff asserts that the ALJ erred in three respects. First, she states that he erred in finding that the plaintiff had no severe impairments, either physical or mental. Second, plaintiff asserts that the ALJ erred by not giving controlling weight to the opinion of her treating physician, Dr. Matthews. Third, she asserts that the ALJ erred in failing to find her testimony and complaints about her symptoms to be credible.

Dr. Matthews was plaintiff's primary treating physician. It is true that the medical opinion of a treating physician is entitled to controlling weight, but *only* if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(c)(2). Other than Dr. Matthews' one line opinion, there is no opinion from anyone else that the plaintiff is disabled, only that she has some physical and mental limitations. Also, the final decision on whether a claimant is disabled is an issue reserved to

15

the Commissioner. 20 C.F.R. § 404.1527(d)(2). Dr. Matthews' tersely worded opinion, in its entirety, is that plaintiff "has a chronic medical problem that has left her disabled and unemployed since February 29, 2012." (Tr. 262). An opinion that the plaintiff is disabled is not a medical opinion, but the ultimate issue to be decided by the ALJ. Plaintiff asserts that this opinion is consistent with the opinions of the other examining and non-examining physicians and psychologists. This is an overstatement. In fact, none of the other health care professionals opined that the plaintiff was, or was not, "disabled." Likewise, the opinion is vague on what the precise "chronic medical problem" was, or how it affected plaintiff's work-related activities. Dr. Matthews' opinion is not entitled to controlling weight. Considering the lack of specifics, it was also not error for the ALJ to fail to give it great weight.

The much more serious issue relates to the ALJ's finding that the plaintiff had no severe impairments. As plaintiff points out, the Sixth Circuit in *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) held the following:

> [I]n this Circuit the step two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 has been construed as a de minimis hurdle in the disability determination process. *Murphy v. Secretary of Health and Human Services*, 801 F.2d 182, 185 (6th Cir.1986); *Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 690–92 (6th Cir.1985); *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89–90 (6th Cir.1985). Under the prevailing de minimis view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience. *Farris*, 773 F.2d at 90.

Thus, it is a very low burden to meet, and at the appellate level, it is rare for the

16

Commissioner to find that a claimant has no severe impairments. Of course, it would certainly be possible if no treating, examining or evaluating source supplied substantial evidence that a claimant had any work related limitations.

However, here we are dealing with the opposite situation. *All* of the doctors and psychologists who examined or treated plaintiff or reviewed her medical records and offered opinions on her capabilities found that the plaintiff had more than a slight abnormality that would minimally affect the plaintiff's ability to work. Here, these medical and mental health professionals examined the plaintiff, or carefully reviewed her records, and interpreted what they saw to mean that the plaintiff was restricted in some work-related way. This is not a case of an ALJ giving greater weight to a non-examining state agency doctor or psychologist than to the opinion of other doctors or psychologists who did treat or examine the plaintiff. Here, the experts who gave opinions were, with one exception, unanimous in finding and opining a level of restriction beyond the de minimis hurdle described above. The only exception was Dr. Dew, and Dr. Dew gave his final opinion *before* the cervical MRI was conducted, saying that "if we are unable to find any changes, then there won't be any restrictions or limitations thereafter." (Tr. 206). The MRI revealed an osteophyte complex which "likely compresses the left C6 nerve in the neural foramen." (Tr. 210). Other doctors did offer opinions on this MRI, and all of the other medical records, and opined that she was limited to a reduced range of light work. (Tr. 69-72 and 89-92). Yet, Dr. Curtsinger and Dr. Johnson opinions were given little weight, as was the consultative examiner Dr. Gilbert.

With respect to the plaintiff's mental impairments, both Dr. Lawthorn, and Drs. Coyle

17

and Tucker, were given little weight even though they all found moderate mental limitations and a need to not have frequent contact with the public.

The question becomes, who can better interpret the medical data to discern the restrictions the plaintiff may have as a result of her medical conditions: the doctors and psychologists or the ALJ? If this were a question of the ALJ crediting the opinion of one physician or psychologist over another, it would be a different situation. That is certainly his prerogative as finder of fact. However here, there is a layperson (from a medical standpoint) changing "moderate" to "mild" across the board, and finding a person with a pinched nerve in her neck to have no physical limitations, with *no other professional opinion to support him and all of the professional opinions holding to the contrary*. When all professional opinions were rejected, the ALJ did not seek other evidence to clarify and shed light on plaintiff's capabilities, but interjected his own interpretation of the records as to which all of those professionals had reached a different conclusion. He was not weighing evidence but interpreting medical data on his own. The Commissioner's position is not substantially justified.

The issue of the plaintiff's credibility, as framed by the plaintiff, is somewhat bound up with the rejected opinions of the various medical experts. The Court feels that since the ALJ's treatment of those opinions is determinative as to the course of action this case should take, it is not necessary to now address the ALJ's finding regarding plaintiff's credibility.

Does the record contain conclusive proof that the plaintiff is in fact disabled? While it contains evidence that the plaintiff has severe impairments, it does not establish that this

18

Court should decree entitlement to benefits. It could well be that a person who could perform a reduced range of light work with certain postural and manipulative restrictions and a need to not have frequent contact with the public could perform a substantial number of jobs. That is within the domain of a vocational expert. Therefore, the plaintiff's request for an award of benefits on the record as it now stands should be denied, and the case remanded to the Commissioner for further analysis beyond step two of the sequential evaluation process. To this extent, it is recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 15] be GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 17] be DENIED.[1]

        Respectfully submitted,

        s/ Clifton L. Corker
        United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).